**Louise VAN SICKEL, Plaintiff/Appellant,**

v.

**Randall HOWARD, Defendant/Appellee.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

March 25, 1994.

Application for Permission to Appeal
Denied by Supreme Court
July 18, 1994.

Ricco Gatti, Jr., Gene E. Piccirilli, Memphis, for plaintiff/appellant.

James F. Eggleston, Memphis, for defendant/appellee.

FARMER, Judge.

This appeal arises from a lawsuit filed by Appellant, Louise Van Sickel, against Appellee, Randall Howard, for personal injuries allegedly resulting from an automobile accident on March 30, 1987. Van Sickel initially sought damages totalling $150,000. The amount was twice amended pursuant to motion, with Van Sickel ultimately seeking $5,000,000 in damages. The jury determined that Van Sickel's total damages were $14,000. Howard was found ninety percent (90%) negligent and the driver of the vehicle in which Van Sickel was a passenger, LaRae Nichols, was found ten percent (10%) negligent. The trial court entered judgment on a jury verdict awarding $12,600 in damages to Van Sickel and denied her motion for new trial.

Van Sickel presents the following issues on appeal:

I. The amount of the verdict is so contrary to the greater weight and preponderance of the evidence as to show passion, prejudice or unaccountable caprice on the part of the jury.

II. The court erred in allowing defense attorney to amend his answers to interrogatories during trial and allowing the defendant's witness, Alan Pynes, to testify at the trial when defendant's attorney had not provided the name of said witness to plaintiff's attorney until after plaintiff and her live witnesses, both local and from Dallas, Texas had testified and been dismissed.

III. The court erred in charging comparative negligence when there was no evidence or proof that the driver of the vehicle in which plaintiff was a passenger was guilty of any negligence whatsoever.

Van Sickel insists that she was inadequately compensated due to the jury's arbitrary disregard of the evidence. She contends that the "uncontradicted and unimpeached" medical proof establishes that she suffers from a disease known as fibromyalgia, which was either caused by the trauma from the automobile accident or was a preexisting condition aggravated by the accident. She further asserts that the evidence shows that her medical expenses alone are $45,193.08.

The amount of damages to be awarded is primarily an issue for the jury and a jury verdict, approved by the trial judge, is entitled to great weight on appeal. *Karas v. Thorne*, 531 S.W.2d 315, 317 (Tenn. App.1975). Where issue is taken regarding the inadequacy of the amount of the verdict, this Court will weigh the evidence, not merely to determine the bare preponderance, but to determine whether the evidence so greatly preponderates against the amount awarded as to show passion, prejudice or unaccountable caprice. *Karas*, 531 S.W.2d at 317; *Board of Mayor and Aldermen v. Moore*, 33 Tenn.App. 561, 232 S.W.2d 410, 413 (1950).

Van Sickel testified that she is a divorced mother of one. At the time of the accident, she was a legal secretary for a large law firm and had started a catering business "on the side." On the day following the accident, she saw Dr. Van Rushing for treatment of her injuries. X-rays of her knee and shoulder were taken and she received medication.

Two days after the accident, half of one of her molars fell out. At this time, she was experiencing pain and discomfort in her jaw area, including her neck and shoulder. She continued working, but was out fifty-five (55) days in 1989 due to sickness which included "horrible headaches," body aches and fever. Van Sickel left her employment in January 1990. She was referred to various doctors including two massage therapists and a psychologist. She continues to receive treatment from a massage therapist. She stated that she can no longer do the things that she used to do, such as cleaning, cooking, entertaining people, shopping and attending church activities. At the time of the accident, she weighed approximately 175 pounds. On cross-examination, she admitted to having "problems" with her son during the years 1986 to 1989 and that this had led to an increased amount of stress in her life.

Dr. James Francis testified that his practice is primarily limited to "patients with headache" and stated that "I don't really know what the cause of fibromyalgia is, and I don't think anybody does." Francis first saw Van Sickel in February 1990 at which time he took a history from her and determined that she had two types of headaches, migraine and muscular. He also made a diagnosis of fibromyalgia. He acknowledged that if the history given by the patient is inaccurate, then his opinion based on that history may well be inaccurate. Francis stated that trauma is a causative factor of fibromyalgia in "probably 20 percent of cases." He also listed stress and viral infection as causative factors. He said that fibromyalgia may be associated with other conditions such as irritable bowel syndrome and chronic fatigue syndrome and confirmed that Van Sickel suffered from both. He testified that, according to the records of Van Sickel's rheumatologist, Dr. Lakhanpal, she has suffered from irritable bowel syndrome since 1984. Francis stated that not just the accident, but Van Sickel's "total life situation" may increase her stress level, and that Van Sickel had indicated to him that there was a relationship between her emotional stress and her headaches. Francis stated that Van Sickel also related that she had backaches and pain in her hips, knees, ankles and neck. Francis

concluded that these symptoms were not a part of the fibromyalgia syndrome, but were "more probably related to her weight."

Dr. David Buhner, practicing predominantly in rheumatology and pain management, testified that he began treating Van Sickel in May 1990 and obtained a history from her. Based on her history and a physical examination, Buhner made a diagnosis of fibromyalgia. Buhner acknowledged that he did not know the cause of the disease but recognized an association with trauma. He stated that given Van Sickel's history, there is an immediate correlation between the onset of her illness and the motor vehicle accident and that the accident did indeed trigger the illness. Buhner confirmed that his medical opinion was based entirely upon Van Sickel's history as related by her and his physical examination. If given an inaccurate history, then his opinion, based entirely upon this information, would also be inaccurate.

Dr. Edward Weiner also treated Van Sickel, beginning in April 1990. Weiner believes that Van Sickel's condition started after a motor vehicle accident. He agrees that no one knows what causes fibromyalgia. Weiner diagnosed Van Sickel as having an eating disorder and stated that she has emotional problems. He stated that he relied 100% on the history given him by Van Sickel and if the history is inaccurate, then his opinion may also be inaccurate.

Psychologist Mark Voeller clinically interviewed Van Sickel in September 1990 and diagnosed her as having "moderately severe depression." He further diagnosed psychological factors affecting her physical condition and an atypical eating disorder. Voeller confirmed that Van Sickel's eating disorder developed long before her diagnosis of fibromyalgia or the auto accident.

Dr. Richard Jackson diagnosed Van Sickel with temporomandibular joint (TMJ) dysfunction and stated that, "there is a chance that this condition was similar to this before she was in the automobile wreck, but the automobile wreck produced some soft tissue injuries that would now not heal under the condition." He prescribed medication and stated that her condition "would tend to be

very deteriorating." Jackson stated that Van Sickel informed him that she broke a tooth on July 4, 1987. He did not see Van Sickel from February 17, 1987 to July 11, 1987. The three biggest causes of TMJ dysfunction are clinching, grinding and malocclusion. Jackson opined that the only reason he relates the TMJ dysfunction with the automobile accident is because of the information conveyed to him by Van Sickel and that if such were inaccurate, then his opinion would also be inaccurate.

Dr. Theodore Pincus, a rheumatologist, testified that fibromyalgia "is a condition in which individuals experience generalized musculoskeletal pain not usually only limited to joints ... for which one does not identify any specific abnormality of x-rays or laboratory tests." Pincus opined that no one "really knows what might cause this sort of problem." Although Pincus never treated Van Sickel, he reviewed the records of her treating physicians to determine that she was obese, had undergone a gastric stapling procedure and had been diagnosed with chronic fatigue syndrome, depression, TMJ discomfort and fibromyalgia. In his opinion, fibromyalgia is not caused by physical trauma and the automobile accident in question could not have caused Van Sickel's diagnosis of fibromyalgia. Pincus continued, "in the case of [Van Sickel], ... she had had generalized musculoskeletal pain in the records many years before this accident. And it's quite possible that her pain was ... in a condition that comes and goes may have seemed more prominent after the accident, but it would be most unlikely to conclude that the accident could have initiated a process that was there years before." According to Pincus, chronic fatigue syndrome is not caused by trauma, but any musculoskeletal pain can be aggravated by it. He said that TMJ problems are seen in people diagnosed with fibromyalgia.

On cross-examination, Pincus was asked, "do you have an opinion as to whether or not a person could have fibromyalgia and it not be giving them ... much of a problem, or may not even know about it which would be aggravated by trauma," to which he replied:

A person could have fibromyalgia aggravated by trauma. But, again, I have to come back to everything that I understand about causation of disease and say ... that every day there are people with fibromyalgia who experience motor vehicle accidents.... And it's very unusual for that to result in this kind of clinical outcome three years later. And in fact it's so unusual as to make it impossible for me to attribute anything to that kind of trauma.

Pincus further stated, "if a motor vehicle accident could precipitate fibromyalgia, one would have to see that in a certain frequency of the cases that's beyond coincidence. And that's just never been shown."

Van Sickel's former employer, John Bauman, testified that Van Sickel worked as his personal secretary for approximately eight or nine years. He rated Van Sickel as a "very good" secretary prior to the middle of 1989. In 1989, there were additional absences and "a marked difference in emotional responses." Van Sickel began working for both Bauman and another attorney in this same year. The increased work load caused Van Sickel to complain about being "overworked."

Based upon our review of the record, we conclude that the evidence does not so greatly preponderate against the amount of damages awarded as to show passion, prejudice or unaccountable caprice on behalf of the jury. The testimony of Dr. Pincus establishes that doubt exists in the medical community as to whether trauma, such as that sustained in an automobile accident, can cause fibromyalgia. The record indicates a concurrence on behalf of the testifying medical experts that no one knows what causes the condition. Although Drs. Buhner and Weiner attributed the trauma from the automobile accident as aggravating the preexisting condition of fibromyalgia, their opinions were admittedly due to the history taken from Van Sickel. In fact, all the medical opinions were based upon Van Sickel's own history, with the exception of Dr. Pincus. The record reveals that Van Sickel's credibility was brought into question during the trial. It is reasonable to conclude that the jury accredited Pincus' testimony. It is obvious that the jury felt that Van Sickel should be compensated. The amount of damages awarded reflects a reasonable assumption by the jury

that many aspects of her present condition are attributable to other medical problems and the stresses in her personal life.

■ Van Sickel takes issue with the trial court's allowance of the testimony of Alan Pynes. Howard supplemented his answers to interrogatories to include Pynes' name as a person having knowledge of discoverable facts after the testimonies of Van Sickel, her son Jason and friend Vicki Rainey. The interrogatories were originally answered in May 1991. Howard contends that Pynes' testimony only became relevant after all three testified that Van Sickel had continuously used a cane for assistance since April or the Spring of 1990. Pynes, a private investigator, testified that he was hired by counsel for Howard to conduct an "activities check" on Van Sickel. The check occurred in August and September 1990. On August 20, 1990, he observed Van Sickel walking to and from her home without the use of a cane. Photographs taken of her at this time were introduced into evidence. Pynes testified that he again observed her on August 24, 1990, walking without the assistance of a cane.

The record reveals the following communication between counsel and the trial court regarding the admission of Pynes' testimony:

MR. EGGLESTON: .... I've talked to Mr. Gatti and told him exactly what, you know, this is. I also have informed him that I have some photographs of Mrs. [Van Sickel] on the 20th, and a very, very short videotape of her getting into a car on the 24th. And I just wanted—I made Mr. Gatti aware of that. And I wanted to make the Court aware of that....

THE COURT: You are not surprised after his interrogation of those two witnesses yesterday that he had some pictures, are you?

MR. GATTI: .... And all—with what was given me that this witness is going to say, I'm not going to bring an objection.

MR. EGGLESTON: Good.

THE COURT: We don't have any problem.

Counsel for Van Sickel subsequently "reconsidered" and informed the court that he wished to withdraw his agreement by consent.

■ We conclude that counsel effectively waived any objection to the admission of this testimony. In the absence of a waiver, however, the decision to allow a witness to testify remains in the sound discretion of the trial judge, even if the name of the witness is withheld in violation of the discovery rules. See Doochin v. United States Fidelity & Guar. Co., 854 S.W.2d 109, 114 (Tenn.App. 1993). We find no abuse of discretion by the trial court in allowing the testimony of the witness.

■ Van Sickel contends that the trial court erred in charging the jury on comparative negligence. LaRae Nichols testified that she was driving a Jeep Cherokee at the time of the accident with Van Sickel riding in the front passenger side. Nichols stated that she was heading south on Germantown Road when a car heading north made a direct left turn in front of her, followed by Howard's vehicle. She avoided the first vehicle and collided with the Howard automobile directly in the intersection. Howard testified that before he attempted to turn left, his automobile and the vehicle in front of him were stopped. On cross-examination, Nichols testified that she did not see either of the vehicles stopped prior to turning left.

Howard correctly cites Nash–Wilson Funeral Home, Inc. v. Greer, 57 Tenn.App. 191, 417 S.W.2d 562 (1966) for the following:

[I]t being a basic requirement of due care in the operation of an automobile that the driver keep a reasonably careful lookout for traffic upon the highway "commensurate with the dangerous character of the vehicle and the nature of the locality" (Hale v. Rayburn, 37 Tenn.App. 413, 264 S.W.2d 230), "and to see all that comes within the radius of his line of vision, both in front and to the side." Hadley v. Morris, 35 Tenn.App. 534, 249 S.W.2d 295, 298.

Nash–Wilson, 417 S.W.2d at 565. We hold that the trial court committed no error in charging the jury on comparative negligence.

The judgment of the trial court is affirmed. Costs are taxed to Louise Van Sickel, for which execution may issue if necessary.

TOMLIN, P.J. (W.S.), and HIGHERS, J., concur.